FILED
CLERK U S DISTRICT COURT

05-02-03

CENTRAL DISTRICT OF CALIFORNIA

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANNA KOURNIKOVA,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL MEDIA COMMUNICATIONS, INC., a New York Corporation,<br><br>Defendant. | Case No. CV 02-3747 GAF (AJWx)<br><br>**ORDER RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON LANHAM ACT CLAIM OF THE FIRST AMENDED COMPLAINT** |

☑ Docketed
☑ Copies / NTC Sent
☑ JS - 5 / JS - 6
___ JS - 2 / JS - 3
___ CLSD

ENTERED
MAY - 5 2003
CENTRAL DISTRICT OF CALIFORNIA
BY

I.

## INTRODUCTION

Plaintiff Anna Kournikova, the popular and internationally-known women's tennis player, brings suit against General Media Communications, Inc. ("GMC") for publishing in <u>Penthouse</u> Magazine partially nude photographs of another woman falsely identified as Kournikova.  Kournikova claims that the display of these falsely identified photographs constitutes false advertising and false endorsement under Section 43(a) of the Lanham Act.  GMC now moves for summary judgment on the Fifth Cause of Action in the First Amended Complaint ("FAC") asserting that Kournikova lacks standing to assert the false advertising claim, that the undisputed facts are insufficient to permit either the false advertisement or the false

1

117

1  endorsement claim to be presented to a jury, and that the First Amendment bars

2  Kournikova's false endorsement claim because she has no evidence that GMC acted

3  with bad intent.

4  The Court agrees that the false advertising claim lacks merit.  The Fifth Cause

5  of Action, contains no allegations that amount to a false advertising claim, and the

6  record shows no evidence of competitive injury even though the Court is now

7  convinced that Kournikova may in fact compete with GMC in certain markets.

8  Accordingly, the Court **GRANTS** the motion with respect to the false advertising

9  portion of the Lanham Act claim.

10  Furthermore, although the nature of the litigation makes the false

11  endorsement claim a more appropriate approach, the Court also agrees with GMC

12  that it is entitled to summary judgment with respect to this claim.  The Court has

13  scrutinized Kournikova's evidence to determine whether or not she has

14  demonstrated the existence of a genuine issue of material fact for trial and concludes

15  that she has not.  Nor has she adequately alleged that GMC acted with actual malice

16  to violate Plaintiff's First Amendment rights.  On the undisputed facts of record, the

17  Court concludes that judgment should be entered in favor of GMC on the false

18  endorsement claim.  Accordingly, the Court also **GRANTS** GMC's motion for

19  summary judgment on that aspect of Kournikova's Lanham Act claim.

20  II.

21  **FACTUAL BACKGROUND**[1]

22  The following facts are undisputed or found by this Court to be without

23  substantial controversy.

24

25

26  [1] Because a substantial portion of the Defendant's Statement of Uncontroverted Facts ("SUF")
27  and Plaintiff's Statement of Genuine Issues ("SGI") contain factual or legal conclusions, much
   of the background information is taken from Plaintiff's FAC, declarations relating to this motion,
28  and declarations relating to prior motions.  Facts relating specifically to issues of competition,
   endorsement, confusion, and the like are discussed in the analysis section.

2

1

**A. *PENTHOUSE* ACQUIRES PHOTOGRAPHS**

2      Defendant GMC publishes and distributes Penthouse, a magazine known for

3  its sexually explicit pictorials, and maintains the "Penthouse.com" website.  (FAC ¶¶

4  10, 14).  In January 2002, Penthouse received a call from an amateur videographer,

5  Frank Ramaesiri ("Ramaesiri"), who claimed to have nude photographs of

6  Kournikova, a professional tennis player who derives a substantial amount of her

7  annual income from her endorsement and sponsorship of various corporations and

8  products.  (FAC ¶ 8, 16; de Picciotto Decl. ¶¶ 4-6).  Penthouse publisher Bob

9  Guccione met with the photographer, viewed the photographs, and authorized their

10  publication.

11

**B. *PENTHOUSE* PUBLISHES THE PHOTOGRAPHS**

12      In its June 2002 issue, Penthouse published the purported Kournikova

13  photographs.  (SUF ¶¶ 1, 3; SGI ¶¶ 1, 3).  The following headline appeared on the

14  magazine's front cover: "EXCLUSIVE ANNA KOURNIKOVA CAUGHT CLOSE UP

15  ON NUDE BEACH," and on the magazine spine appeared the words, "ANNA

16  KOURNIKOVA . . . PET OF THE YEAR PLAYOFF."  (FAC, Exh. A).  The magazine

17  contained a six page article with pictures of a woman, identified as Kournikova,

18  sunbathing topless.  (SUF ¶ 3; SGI ¶ 3).   Defendant also used Kournikova's name

19  and the photographs at issue on its website, Penthouse.com, and as of May 1, 2002,

20  Penthouse reported that "Anna denies [that the alleged photographs of her are] the

21  real thing."  (SUF ¶ 8; SGI ¶ 8; FAC, Exh. B).

22

**C. THE SOLTESZ-BENETTON COMPLAINT**

23      On May 6, 2002, Judith E. Soltesz-Benetton (the woman actually pictured in

24  the photos) filed a complaint in the United States District Court for the Southern

25  District of New York.  (FAC ¶ 32).  On that same day, District Judge Denny Chin

26  issued a temporary restraining order requiring GMC to cease running any of the

27  photographs on its website and to cease distributing any additional copies of its June

28

1  2002 issue.  (Id. ¶ 34).  The following day, <u>Penthouse</u> publically admitted its error.

2  (Id. ¶ 35).  On May 7, 2002, Kournikova initiated this action.  (Mot. at 3).

3         On May 14 and 15, 2002, Judge Chin held a two-day preliminary injunction

4  hearing and advised the parties that he would issue his decision by May 20, 2002.

5  (Id. ¶ 36).  However, the issue was mooted because Soltesz-Benetton settled her

6  dispute with GMC on the morning of May 20, 2002.  (Id. ¶ 37).  As part of that

7  settlement, GMC agreed to destroy the approximately 18,000 copies of the June

8  2002 edition of <u>Penthouse</u> Magazine still in its possession.  (Id.).

9  **D. KOURNIKOVA'S COMPLAINT**

10        In the meantime, Kournikova filed this lawsuit.  Kournikova's claims are set

11  forth in her FAC, which includes a false advertising and false endorsement claim

12  under Section 43(a) of the Lanham Act.  That cause of action is the subject of GMC's

13  present motion for summary judgment.

14                                   III.

15                               **ANALYSIS**

16  **A. THE LEGAL STANDARD**

17        The Court may grant summary judgment where "the pleadings, depositions,

18  answers to interrogatories, and admissions on file, together with the affidavits, if any,

19  show that there is no genuine issue as to any material fact and that the moving party

20  is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Thus, when

21  addressing a motion for summary judgment, this Court must decide whether there

22  exist "any genuine factual issues that properly can be resolved only by a finder of

23  fact because they may reasonably be resolved in favor of either party."  <u>Anderson v.</u>

24  <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

25        The moving party bears the burden of demonstrating the absence of a

26  genuine issue of fact for trial.  Id. at 256.  A party opposing a properly made and

27  supported motion for summary judgment may not rest upon mere denials but "must

28  set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P.

                                   4

1   56(e). In particular, when the non-moving party bears the burden of proving an

2   element essential to its case, that party must make a showing sufficient to establish a

3   genuine issue of material fact with respect to the existence of that element or be

4   subject to summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 322,

5   (1986).

6         An issue is genuine if evidence is produced that would allow a reasonable jury

7   to reach a verdict in favor of the non-moving party. See Anderson, 477 U.S. at 248.

8   The Court will assume the truth of direct evidence set forth by the opposing party.

9   See Hanon v. Dataproducts Corp., 976 F.2d 497, 507 (9th Cir. 1992). However,

10  where circumstantial evidence is presented, the Court may consider the plausibility

11  and reasonableness of inferences arising therefrom. See Anderson, 477 U.S. at

12  249-50; TW Elec. Serv., Inc, v. Pac. Elec. Contractors Ass'n, 809 F.2d 626. 631-32

13  (9th Cir. 1987). In that regard, "a mere 'scintilla' of evidence will not be sufficient to

14  defeat a properly supported motion for summary judgment; rather, the nonmoving

15  party must introduce some 'significant probative evidence tending to support the

16  claim.'" Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997)

17  (quoting Anderson, 477 U.S. at 252, 249); Eisenberg v. Ins. Co. of N. Am., 815 F.2d

18  1285, 1288 (9th Cir. 1987) (holding that summary judgment may be granted if "the

19  evidence is merely colorable...or is not significantly probative").

20  **B. THE PENDING MOTION**

21        The present motion addresses two claims stated in the Fifth Cause of Action –

22  false advertising and false endorsement – both brought under Section 43(a) of the

23  Lanham Act. In the motion, GMC presents three principal arguments:

24              (1) Kournikova lacks standing to bring a false advertising claim because she

25                   is not "a competitor of Penthouse in any meaningful sense."

26              (2) Kournikova's false endorsement claim should be dismissed because no

27

28

5

1    reasonable customer would be likely to believe that Kournikova had

2    voluntarily associated herself with <u>Penthouse</u> magazine.[2]

3    (3)    The First Amendment bars Kournikova's false endorsement claim

4        because she cannot present any evidence that <u>Penthouse</u> intended to

5        confuse customers regarding an association with <u>Penthouse</u> because the

6        magazine published Kournikova's protest that the photographs were not

7        authentic.

8        In summary, the Court concludes that Kournikova has presented sufficient

9    evidence to establish that she competes with <u>Penthouse</u> in certain markets for

10   certain products but that she has presented no evidence of competitive injury. While

11   the Court concludes that she has standing to bring the claim, the absence of

12   evidence of competitive injury compels the conclusion that the false advertisement

13   claim should be summarily adjudicated in favor of GMC. With respect to the false

14   endorsement aspect of her claim, Kournikova has not demonstrated the existence of

15   genuine issues of fact as to whether or not a reasonable consumer might conclude

16   that she had voluntarily associated herself with <u>Penthouse</u>. In addition, Plaintiff's

17   claim fails because she cannot demonstrate that GMC acted with actual malice in

18

19

20   _____

21   [2]   Defendant bases its motion in part on observations made by the Court in response to
     Kournikova's motion for preliminary injunction. Defendant places undue reliance on those

22   statements, made at an early stage of the proceedings and in connection with an analysis under
     a different legal standard.   At the motion for preliminary injunction, the Court was required to

23   balance the likelihood of success on the merits against the relative hardships of granting or
     denying the motion. Since a retraction had already been published and an agreement had been

24   reached by GMC (in another case) to destroy the remaining copies of the magazine in its
     possession, the Court concluded that the balance did not favor the issuance of the requested

25   injunction. The Court at that time expressed skepticism regarding the merits of Kournikova's
     Lanham Act claims, a consideration that it was required to undertake to resolve the preliminary

26   injunction request. The Court's views, however, have no bearing on a motion for summary
     judgment. Here the Court has focused only on whether genuine issues of material fact remain

27   for trial regardless of the Court's own views on the claims' merits. Thus, the Court's ruling in this
     case is not a reflection of its views on the merits, but rather its views on the state of the

28   evidence.

1   creating the alleged false endorsement to violate her First Amendment rights.  For

2   these reasons, as discussed more fully below, the motion is **GRANTED**.

3

4   **C. SECTION 43(A) OF THE LANHAM ACT**

5        "Section 43(a) of the Lanham Act (15 U.S.C. § 1125), prohibits the use of

6   false designations of origin, false descriptions, and false representations in the

7   advertising and sale of goods and services." Waits v. Frito-Lay, Inc., 978 F.2d 1093,

8   1106 (9th Cir. 1992), (citing Smith v. Montoro, 648 F.2d 602, 603 (9th Cir. 1981)).[3]

9   Lanham Act Section 43(a) jurisprudence recognizes two distinct protectable

10  interests: protection against unfair competition in the form of an action for false

11  advertising and protection against false association in the form of a lawsuit for false

12  endorsement. Waits, 978 F.2d at 1109.  Kournikova claims to be seeking recovery

13  under both aspects of Section 43(a) as her Fifth Cause of Action bears the label:

14  "False Endorsement and False Advertising in Violation of 15 U.S.C. § 1125."

15  However, as the Court explains below, the language of the Fifth Cause of Action

16  describes nothing that the law recognizes as a claim for false advertising, and

17  Kournikova otherwise presents no evidence of competitive injury resulting from

18  GMC's conduct.

19  _____

20  [3]  The text of the statute reads:

21         (1) Any person who, on or in connection with any goods or services, or any container
    for goods, uses in commerce any word, term, name, symbol, or device, or any
    combination thereof, or any false designation of origin, false or misleading description

22  of fact, or false or misleading representation of fact, which--

23         (A) is likely to cause confusion, or to cause mistake, or to deceive as to the
    affiliation, connection, or association of such person with another person, or as

24  to the origin, sponsorship, or approval of his or her goods, services, or
    commercial activities by another person, or

25         (B) in commercial advertising or promotion, misrepresents the nature,
    characteristics, qualities, or geographic origin of his or her or another person's

26  goods, services, or commercial activities,

27  shall be liable in a civil action by any person who believes that he or she is or is likely to be
    damaged by such act.

28

### 1. False Advertising

False advertising cases generally involve some sort of misrepresentation in the marketplace that causes "a discernibly competitive injury." Id. Standing under this line of cases requires a showing that: (1) the plaintiff competes with the defendant in some marketplace, Halicki v. United Artists Communications, Inc., 812 F.2d 1213, 1214 (9th Cir. 1987); (2) the plaintiff has alleged a discernibly competitive injury resulting from a misrepresentation in the marketplace, Waits, 978 F.2d at 1109; and (3) the misrepresentation implicates some purpose of the Lanham Act regarding the use of trademarks. Id.; see also Halicki, 812 F.2d at 1214 (Lanham Act should not be construed to create a federal "tort of misrepresentation").

The meaning of "competitor" has been addressed in case law from this district. Judge Collins wrote that "[c]ompetitors are '[p]ersons endeavoring to do the same thing and each offering to perform the act, furnish the merchandise, or render the service better or cheaper than his rival.'" Summit Tech. v. High-line Med. Instruments, Co., 933 F. Supp. 918, 937 (C.D. Cal. 1996) (quoting Fuller Bros., Inc. v. Int'l Mktg., Inc., 870 F. Supp. 299, 303 (D. Or. 1994)). This pragmatic approach counsels against the sort of argument presented in this case where GMC asserts that standing does not exist because it is involved in publishing and Kournikova in professional sports. Rather than engaging in simplistic labeling, the Court must determine whether or not the two parties vie for the same dollars from the same consumer group, and whether the conduct of the defendant, if true, could be said to create "competitive injury."

In Waits, the Ninth Circuit described the scope of the phrase "competitive injury" in explaining its earlier ruling in Halicki. Waits, 978 F.3d at 1108-09. Halicki involved a complaint by a producer alleging that United Artists, the film distributor with whom he had contracted, falsely represented that it would market his film with a "PG" rating but ultimately released it with an "R" rating. Halicki, 812 F.2d at 1214. Because Halicki was not competing with United Artists, the Ninth Circuit held that he

lacked standing to pursue a claim under the Lanham Act. 812 F.2d 1213-14. The

panel in Waits contrasted the Halicki facts with a similar, but distinguishable,

hypothetical:

> We take an example close to Halicki's facts, assuming for purposes of
> this hypothetical only that producers may rate their own films. If a film's
> distributor wrongfully indicates that a film is "PG"-rated when in reality it
> should be "R"-rated, a competitor with a PG-rated film would have
> standing: the mis-rated film theoretically draws young audiences away
> from the competitor's film because of the misrepresentation concerning
> the suitability of its content.

978 F.2d at 1109; see also Barrus v. Sylvania, 55 F.3d 468, 470 (9th Cir. 1995)

(standing in false advertising cases based on conduct "harmful to the plaintiff's ability

to compete with the defendant"). Thus, under Waits, if one participant in the

marketplace makes false statements that could theoretically draw consumers away

from similar offerings of other participants in the same marketplace, and those false

statements implicate the purposes of the Lanham Act (such as protection of

trademarks or prevention of unfair competition), then those other participants have

standing to bring suit under the Lanham Act for unfair competition in the form of false

advertising.

### a. Kournikova and GMC are Competitors

Plaintiff maintains that she and GMC are competitors. (Opp. at 6). GMC

contends otherwise. Although the two parties are nominally engaged in what might

seem to be distinctly different businesses (athletics and publishing), that distinction is

both artificial and simplistic. In reality, both of them are engaged in the

entertainment business. GMC publishes Penthouse, a magazine predominantly

devoted to sexually oriented themes, and markets a variety of videos and calendars.

(Id.). Kournikova, though a participant in the women's pro tennis tour, also pursues a

(possibly more successful) career as a model and sex symbol and likewise markets

videos and calenders. (Id.). Both parties sell these products over the Internet and through a variety of magazines and retailers. (Id. at 7). Indeed, as of the date of the drafting of this order, the Court found at Kournikova.com a photograph labeled "Hot Feature" accompanied by a photograph of Kournikova in a bikini bathing suit and the following words: "Anna's official 2003 calendar is here!  Be sure to get your copy today!"  A click on the hyperlink takes one to the John F. Turner & Co. site where Kournikova's photograph in a bathing suit appears on the left side of the screen, and Pamela Anderson in an even skimpier suit appears on the right.  In the Court's view, there is little doubt that, in respect to at least some of their commercial activities, the parties compete for the same dollars from the same target audience – namely men. (Id. at 7, 8).

### b. Kournikova has not Alleged, or Presented Evidence of, Competitive Injury

GMC argues that even if Plaintiff is able to demonstrate that the parties are competitors, Plaintiff's false advertising claim fails because she has not shown a competitive injury. (Reply at 6, 7).  This argument finds support both in the FAC and in the present record.

The FAC's Fifth Cause of Action contains several paragraphs, all of which contain language focusing on the false endorsement prong of a § 43(a) claim.  For example, the core of the Fifth Cause of Action is set forth in paragraph 67, which states in pertinent part:

> Defendant's false and misleading representations are likely to deceive as to the affiliation, connection and association of Penthouse Magazine, Penthouse.com and those media's advertisers, with Ms. Kournikova.  Defendant's false and misleading representations are likely to deceive as to the sponsorship, endorsement, and approval of Defendant's goods and services by Ms. Kournikova.  Defendant's aforesaid acts also constitute the use of false descriptions and false

1  and misleading representations of fact in commercial advertising and
2  promotion, misrepresenting the nature, character, and quality of
3  Defendant's goods and services. As a result of Defendant's acts and
4  representations, members of the public are induced to make
5  payments to Defendant in the mistaken belief that its goods and
6  services are endorsed by, associated with, or affiliated with Ms.
7  Kournikova.

8  Paragraph 69 complains that Kournikova has spent substantial time, effort,
9  and resources developing and protecting her image and goodwill with advertisers
10 and sponsors and that Penthouse and Penthouse.com advertised the magazine
11 "with the intention and effect of misappropriating the valuable goodwill and reputation
12 associated with Ms. Kournikova." Finally, paragraph 71 asserts that, "Defendant's
13 wrongful conduct has permitted or will permit Defendant and its advertisers to
14 increase their sales and their public exposure on the strength of Ms. Kournikova's
15 worldwide marketing, advertising, and consumer recognition."

16 These allegations all focus on the harm to Kournikova that will result from her
17 false association with Penthouse and how it will affect her relationship with other
18 advertisers with whom she has, or may in the future seek to have, endorsement
19 deals. Nothing in this cause of action focuses on losses, other than losses
20 associated with her standing as a spokesperson or endorser, that would flow from
21 her position as a competitor for male dollars spent on photographs of young,
22 attractive women wearing little or no clothing. Although Penthouse and Kournikova
23 may be competing for the use of Kournikova's name and identity, this is not sufficient
24 to constitute a "competitive injury" for standing under a false advertising claim. See
25 Waits, 978 F.2d at 1110. Indeed, the Court in Waits recognized that the wrongful
26 appropriator of a celebrity's image, likeness, or distinctive qualities competes for the
27 use of the celebrity's name or identity, but held that the cause of action in those
28 circumstances is for false endorsement, not false advertising. Id.

11

1         Plaintiff might have overcome the absence of any allegation regarding

2    competitive injury by presenting evidence that she lost sales of videos, calendars,

3    and the like as a result of the <u>Penthouse</u> photo spread.   However, Plaintiff has not

4    provided any evidence of financial loss of any sort and has even admitted that "no

5    endorsement agreements have been terminated or rescinded as a result of the

6    publication of the June 2002 issue of <u>Penthouse</u>."  (Broccolo Decl., Exh. F at 27).

7    Moreover, on the present record, the Court sees no reasonable prospect that

8    Kournikova could present evidence of relevant losses.  The <u>Penthouse</u> issue in

9    question was on the market for approximately 30 days when GMC conceded, in a

10   high profile public announcement, that the photographs in the June 2002 issue did

11   not depict Kournikova.  To show a "discernible competitive injury" Kournikova would

12   have to show a measurable drop in sales of her calendars, exercise videos and the

13   like during the narrow window during which the June 2002 <u>Penthouse</u> issue was on

14   the market before the concession that the issue contained no nude Kournikova

15   photographs, and would have to present some evidence to connect those declines to

16   the publication of the June 2002 <u>Penthouse</u>.  The prospect that such a showing

17   could be made is remote, and Kournikova has not bothered to tilt at that windmill.

18        In short, while Plaintiff offers evidence that she competes with <u>Penthouse</u>, she

19   presents no evidence that she has suffered any competitive injury resulting from

20   GMC's conduct.  Accordingly, GMC's motion for summary judgment on the false

21   advertising claim must be **GRANTED.**

22       **2. False Endorsement**

23          ***a. Standing***

24        "A false endorsement claim based on unauthorized use of a celebrity's identity

25   is a type of false association claim...which is likely to confuse consumers as to the

26   plaintiff's sponsorship or approval of the product."  <u>Waits</u>, 978 F.2d at 1110.  A

27   plaintiff need not plead or prove competitive injury to succeed on such a claim.  The

28   Ninth Circuit has observed that "[s]tanding...does not require 'actual competition' in

1  the traditional sense; it extends to a purported endorser who has an economic

2  interest akin to that of a trademark holder in controlling the commercial exploitation of

3  his or her identity." Id.; Montoro, 648 F.2d, at 603.

4          Although no one could reasonably claim that Kournikova lacks standing to sue

5  for false endorsement, Defendant presents that argument. (Mot. at 6). It merits little

6  attention. The Waits court found that standing to bring a false endorsement claim

7  included "parties with a commercial interest in the product wrongfully identified with

8  another's mark...or with a commercial interest in the misused mark." Waits, 978 F.2d

9  at 1109. In this case, Plaintiff clearly has an interest in promoting and maintaining

10  her own mark – that is an interest in the exploitation of her name and likeness. See

11  id. at 1110. Just as in Waits, the wrongful use of her name and likeness to promote

12  a product with which she has no association raises the possibility of commercial

13  injury. Therefore, Kournikova clearly has standing to pursue a false endorsement

14  claim.

15          **b. Likelihood of Confusion**

16          Kournikova contends that GMC's use of her name and persona in connection

17  with the promotion of its June 2002 edition of Penthouse is likely to cause confusion

18  as to her association with, and endorsement of, the magazine. Such claims are

19  cognizable under the Lanham Act.   See Waits, 978 F.2d at 1106-07; Cairns v.

20  Franklin Mint Co., 107 F. Supp. 2d 1212, 1214 (C.D. Cal. 2000). Moreover, because

21  the names and likenesses of celebrities are commonly, and properly, used in a wide

22  variety of publications, Lanham Act jurisprudence places great importance on the

23  likelihood of consumer confusion as the "determinative issue" in false endorsement

24  claims. Cairns v. Franklin Mint Co., 292 F.3d 1139, 1149 (9th Cir. 2002); Dr. Seuss

25  Enters., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1403 (9th Cir. 1997); see

26  also Abdul-Jabbar v. Gen. Motors Corp., 75 F.3d 1391, 1397 (9th Cir. 1996)

27  ("Newspapers and magazines commonly use celebrities' names and photographs

28

1   without making endorsement contracts, so the public does not infer an endorsement

2   agreement from the use.").

3       Consumer confusion exists when: (1) the defendant used the plaintiff's

4   identity; and (2) the use suggests that plaintiff sponsored or approved the

5   defendant's product. See e.g., Waits, 978 F.2d at 1110-11. Because "[t]he Lanham

6   Act's likelihood of confusion standard is predominantly factual in nature," Wendt v.

7   Host Int'l, Inc., 125 F.3d 806, 812 (9th Cir. 1997), consumer confusion must be

8   determined with reference to the entire record before the Court. Eastwood v. Nat'l

9   Enquirer, Inc., 123 F.3d 1249, 1256 (9th Cir. 1997). Since GMC undeniably used

10  Kournikova's name in the publication of the June 2002 Penthouse issue, the first

11  element of confusion has been established.   Therefore, the Court must focus on

12  whether the use of her name suggested that Kournikova sponsored or approved

13  GMC's product. This requires an examination of the following factors:

14      • the level of Plaintiff's recognition among the segment of the society

15          for whom GMC's product is intended;

16      • the relatedness of Plaintiff's fame or success to GMC's product;

17      • the similarity of the likeness used by GMC to Plaintiff;

18      • evidence of actual confusion;

19      • marketing channels used;

20      • likely degree of purchaser care;

21      • GMC's intent in selecting Plaintiff; and

22      • likelihood of expansion of the product lines.

23  Downing v. Abercrombie & Fitch, 265 F.3d 994, 1007-08 (9th Cir. 2001) (restating

24  the factors set forth in AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341 (9th Cir. 1979) to

25  make them more applicable to the celebrity case). "Although these are all factors

26  that are appropriate for consideration in determining the likelihood of confusion, they

27  are not necessarily of equal importance, nor do they necessarily apply to every

28  case." Id. at 1008.

1

### i.  Strength/Level of Recognition of Plaintiff's Mark

2      "A mark with extensive public recognition and renown deserves and receives

3   more legal protection than an obscure or weak mark."  YKK Corp. v. Jungwoo Zipper

4   Co., 213 F. Supp.2d 1195, 1200 (C.D. Cal. 2002) (quoting Kenner Parker Toys, Inc.

5   v. Rose Art Indus., Inc., 963 F.2d 350, 353 (Fed. Cir. 1992)).  Both sides agree that

6   Plaintiff is a famous celebrity whose strong mark has a high level of recognition.

7   (Mot. at 9, Opp. at 15).  Accordingly, this factor weighs in Plaintiff's favor.

8

### ii.  Relatedness of the Goods

9      "Related goods are those products which would be reasonably thought by the

10  buying public to come from the same source if sold under the same mark."

11  Sleekcraft, 599 F.2d at 348 n.10.  With related goods, "the danger presented is that

12  the public will mistakenly assume there is an association between the producers of

13  the related goods, though no such association exists."  Id. at 350.  GMC contends

14  that Plaintiff is an athlete who does not, and never intends to, work in the adult

15  entertainment industry.  (Mot. at 9).  Therefore, GMC argues, Plaintiff's career and

16  the market for her services is not closely related to its market and services.  (Id.).

17  Plaintiff asserts that GMC's products are photos of female models and that Plaintiff,

18  as a famous athlete with substantial endorsement contracts, is a celebrity

19  spokesmodel.  (Id. at 16).  Accordingly, Plaintiff maintains that analysis of this

20  element requires that the Court weigh conflicting evidence.  (Opp. at 15).

21      As set forth above, the Court has concluded that evidence has been

22  presented to show that the adversaries here *do* compete in certain markets, that

23  both are in the entertainment business, and that the simplistic labeling of their

24  respective businesses ignores important ways in which their respective endeavors

25  overlap.  For that reason, this factor weighs in Kournikova's favor.

26

### iii.  Similarity of the Marks

27      "Obviously, the greater the similarity between the two marks at issue, the

28  greater the likelihood of confusion."  GoTo.com, Inc. v. Walt Disney Co., 202 F.3d

1  1199, 1206 (9th Cir. 2000).  In this case, there is no dispute that Defendant used

2  Plaintiff's name in and on its magazine.  (Mot. at 9; Opp. at 16).  Therefore, this

3  factor weighs in Plaintiff's favor.

### iv.  Evidence of Actual Confusion

5  "Evidence of actual confusion is strong evidence that future confusion is

6  likely...."  Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1393 (9th Cir. 1993).

7  Defendant contends that Plaintiff has not offered any evidence that any customers

8  were actually deceived with respect to her possible endorsement of the magazine.

9  (Mot. at 9).  Plaintiff maintains that proof of actual confusion is not required to sustain

10  a false endorsement claim, as this is but one of many factors.  (Opp. at 16).

11  However, Plaintiff offers an expert's opinion, evidence of a related case, and a

12  survey to demonstrate that actual confusion does exist.  The Court considers each

13  below.

### (A)  The Declaration of Dr. Peter Tiersma

15  To establish the existence of a genuine issue of material fact for trial,

16  Kournikova hired Tiersma to examine the language on the cover ("EXCLUSIVE

17  ANNA KOURNIKOVA CAUGHT CLOSE UP ON NUDE BEACH") and spine ("ANNA

18  KOURNIKOVA...PET OF THE YEAR PLAY-OFF") of the June 2002 Penthouse

19  magazine.  (Tiersma Decl. ¶ 5).  In particular, Tiersma concentrated on the word

20  "caught" to determine whether the word suggested an association between Plaintiff

21  and GMC.  (Id.).  GMC notes with some persuasive force that expert testimony is not

22  admissible to determine the plain meaning of a word and its effect upon a

23  reasonable consumer.  (Reply at 17); See United States v. Kupau, 781 F.2d 740,

24  745 (9th Cir. 1986); Mantech Envt'l Corp. v. Hudson Envt'l Serv., Inc., 152 F.3d

25  1368, 1373 (Fed. Cir. 1998).  The Court agrees with GMC.  But, even if Tiersma's

26  Declaration is considered, it does not create a genuine issue of material fact for trial

27  because his conclusions are not supported by the evidence he cites.

28

16

1          In his analysis, Tiersma reviewed dictionary definitions, colloquial/idiomatic

2    uses, and conducted Internet web searches.  (See Tiersma Decl., Exhs. A - G).

3    Based primarily on his interpretation of "caught," Tiersma concluded that, "people

4    who viewed the cover of the June 2002 issue of Penthouse could have thought that

5    Ms. Kournikova was in some way associated with, or had cooperated with the

6    magazine.  (Tiersma Decl. ¶ 3).  Although "caught" has a number of varying

7    definitions, Tiersma concluded that the primary definitions, involving capture,

8    trapping, or snaring, would not likely come to the reasonable, potential customer's

9    mind, even though he acknowledges that these two definitions "can also be used in a

10   more figurative sense," because, as he recognizes, "it is possible to trap or snare

11   people without literally capturing or holding them."  (Tiersma Decl. ¶ 10).  Ignoring

12   the figurative uses of the term, he found that "caught" in this instance would likely

13   suggest cooperation (i.e. "caught nude" could simply mean "photographed nude").

14   (Id. ¶¶ 12-18).

15        To reach this conclusion, Tiersma suggests the development of a new

16   meaning for the word caught, a meaning connected to photography.  Having

17   conducted an Internet search, he concludes that phrases like "catch a picture" or

18   "catch a photo" indicates the development of a new idiom using the verb "catch."

19   While this may be true, the context in which that phrase appears in the exhibits to his

20   declaration indicate that the new idiom is nothing more than a variant of the figurative

21   use of "trap" or "ensnare."  The examples provided almost universally refer to candid

22   pictures obtained without the active participation (and in some cases without the

23   consent) of the subject of the photograph, where the subject is a person.  The Court

24   notes the following from Exhibits C and D:

25              - referring to a photograph of two people, the photographer states "I

26                caught a photo of the two under-handed with a digital camera"

27              - referring to a subject "Jose" (a cat) who "runs away" when he sees

28

1   "Max" (a toddler), "this time Max caught him napping on one of our
2   kitchen chairs.... Kathy caught a photo of it."
3   - first prize went to Annette Leung, "who caught a photo of her baby
4   daughter kissing the kitty...."
5   - "At the end of the day I caught a photo of another boat crossing through
6   the sunset"
7   - "I caught a quick glimpse of the pike through the trees and caught a
8   photo."
9   - "I just barely caught a picture of a broken-down car by the side of the
10  interstate."
11  - "I caught a picture of this fellow sneaking off with a 20 cent coin...."
12          All of these examples, which come from Tiersma's research, indicate candid,
13  sometimes surreptitious, photographs taken quickly of unposed subjects – the kind of
14  photographs often referred to as "snapshots." These examples, and the underlying
15  analysis, support GMC's assertion that Penthouse readers would have understood
16  that the magazine obtained the photographs of Kournikova without her permission.
17          Tiersma attempts to address this issue by citing the use of the word "caught"
18  in connection with hard core pornographic Internet sites where the young women in
19  the photographs are looking directly into the camera "and are clearly posing."
20  (Tiersma Decl. ¶ 15). Given this evidence, Tiersma then opines:
21          Why do these websites use the phrase "caught nude" as opposed to
22          simply touting something like "exciting nude pictures"? After all, the girls
23          posing in these photographs have not been "caught" in the senses
24          suggested by the dictionary definitions. In my opinion, there are two main
25          reasons. One is – as outlined above – to "catch a picture/photo" seems
26          to be emerging as a novel way of saying to "take a picture" or to
27          "photograph."
28  (Id. ¶ 16).

1    But from all of the evidence, including the contents of Exhibits C and D to his

2    own declaration, "caught" when used in the context of photography means more than

3    taking a picture – it means successfully obtaining a fleeting image of the sort that is

4    difficult to capture, often surreptitiously and usually without cooperation of the

5    subject.  Thus, merely because the word "caught" is used in many descriptions of

6    hardcore pornographic images does not change the broader implication contained in

7    the word "caught" when used in relation to photography in general.  "Catching" a

8    photograph does not simply mean "taking" a photograph, as Tiersma's evidence

9    demonstrates.

10    Tiersma reveals the real motivation for the use of the word "caught" in the

11    world of hardcore pornography in his "second" main reason for the use of the term in

12    that context:

13        Based on a limited review of the thousands of sites containing the phrase

14        "caught nude," it appears that the photographs on these websites are

15        often very graphic and the women or girls seem to be barely of legal age.

16        Not only has their picture been "caught," but they have been "caught" by

17        the photographs doing something quite naughty.  These websites thus

18        engage in a voyeuristic game in which viewers can engage in the fantasy

19        that they are surreptitiously watching these girls and women engage in

20        sexual acts, while at the same time they must know full well that these

21        are in reality models who are posing for a camera and whose images are

22        available for the entire world to see via the internet.

23    (Id. ¶ 17).

24    In other words, as Tiersma acknowledges, "caught" in this context is used,

25    though disingenuously, in the same way it is used in the examples in Exhibits C and

26    D.  To titillate viewers and stimulate their fantasies, the word is used to create the

27    impression that unsuspecting women have been caught in a variety of unposed

28    sexual acts.  In that way, the website operators use the word "caught" with respect

1  to hardcore pornographic images to create an impression that they know is not true –

2  that the models have been "caught" in the same way that Annette Leung "caught" her

3  toddler kissing the family cat.  Nothing in this analysis supports the conclusion that

4  "catch a picture" has emerged as a novel way of saying "take a picture" or "to

5  photograph."

6      Finally, Tiersma notes that this pretended voyeurism can be found on the

7  pages of Penthouse itself.  He references a series of explicit, pornographic

8  photographs of two scantily clad women boxers who, in a series of photographs,

9  undress each other and engage in a variety of sexual acts.  Tiersma suggests that,

10  at one point, they look at the camera as if having been "caught" in the act.  The Court

11  does not interpret the photography in the same way, but that is beside the point.

12  Even if the average reader of Penthouse knows that it offers pretended candid

13  photographs of graphic sexual conduct, it does not follow that the average reader

14  would have any reason to believe that Kournikova was "caught" nude in the same

15  way that pornography stars – amateur or professional – are "caught" nude.

16      Beyond this, there are other critical flaws in Tiersma's study.  First, GMC

17  correctly notes that Tiersma failed to review the magazine as a whole, but instead

18  focused only on the cover and the word "caught." (Reply at 18).  While Tiersma

19  determined that definitions implying a lack of consent (i.e. capture, seize, trap) would

20  not likely pop into a consumer's mind, he offers no dictionary definition that suggests

21  that "caught" is in any way synonymous with cooperation.  Moreover, although

22  Tiersma stated that "people who viewed the cover of the June 2002 issue of

23  Penthouse Magazine **could have thought** that Ms. Kournikova was in some way

24  associated with, or cooperated with, the magazine," (Tiersma Decl. ¶ 7) that is not

25  the relevant standard.  Rather, the question is whether a reasonable consumer

26  would be **likely** to conclude that the Plaintiff endorsed the magazine.  Waits, 978

27  F.2d at 1110; 15 U.S.C. § 1125.  Thus, Tiersma's declaration fails to create any

28  genuine issue of fact with respect to the claim that reasonable consumers would

1    likely have concluded that Kournikova had voluntarily associated herself with

2    Penthouse.

3                    **(B)  _Levin v. General Media Communications, Inc._**

4            In a late filing, Plaintiff provided the Court with a copy of a class action lawsuit

5    filed in Cook County, Illinois.  (See Req. for Jud. Not.).  In that action, a pair of

6    disgruntled Penthouse readers filed suit because they were disappointed to learn

7    that the magazine contained pictures of Judith Soltesz-Benetton, not Kournikova.

8    (See id., Exh. A at 9).  Plaintiff contends that the existence of this class action

9    demonstrates that her false endorsement claim is meritorious and that, at the very

10   least, genuine issues of fact exist.  The Court disagrees.  While the class action may

11   demonstrate that individuals purchased Penthouse because they hoped or believed

12   that it contained pictures of Kournikova, no evidence is offered to show, nor is it

13   argued, that the class action plaintiffs believed that Kournikova **_voluntarily_** posed for

14   the pictures or endorsed Penthouse.  Because the class action fails to address the

15   relevant issue -- endorsement -- it offers no persuasive value.

16                        **(C)  _Craig A. Honick Survey._**

17           At Plaintiff's request, Honick, Partner and Director of Research at Precision

18   Reports,[4] conducted a survey to assess consumer perceptions.  The survey was

19   specifically designed to test GMC's assertion that "no reasonable consumer...would

20   believe that Plaintiff had voluntarily associated herself with Penthouse magazine"

21   based on the magazine's cover.  (Honick Decl. ¶ 5).  After reviewing responses from

22   584 adults (over the age of 18) Honick concluded that the assertion that no

23   reasonable customer would imagine an association was incorrect.  (Id. ¶ 16).

24   Rather, Honick's survey revealed that a substantial portion of the respondents

25   thought that Plaintiff consented to or cooperated with GMC.  Moreover, Honick

26   concluded that this determination is representative of the general public.  (Id. ¶ 17).

27   _____

28   [4] Precision Reports is a research firm "that specializes in conducting research studies to
     determine opinions and perceptions on behalf of clients."  (Honick Decl. ¶ 4).

1    GMC claims that Honick's survey is fundamentally flawed for two primary

2    reasons. First, the survey failed to reach the appropriate and reasonable consumer.

3    (Reply at 20-21). While the sample may have reflected opinions of the general

4    public, it does not represent the appropriate target group – the average <u>Penthouse</u>

5    customer. (<u>Id.</u>). For example, in the last year less than ten percent of the sample

6    population purchased <u>Penthouse</u>, and fewer than 25% purchased <u>Playboy</u>. (<u>Id.</u> at

7    21; Honick Decl., Exh. B. at 494). Citing <u>Avery Dennison Corp. v. Sumpton</u>, 189

8    F.3d 868 (9th Cir. 1999), GMC asserts that the survey therefore provides no

9    meaningful evidence on confusion. (Reply at 21); <u>see</u> <u>Avery Dennison Corp.</u>, 189

10    F.3d at 879 (rejecting reliance on survey, when survey failed to address the

11    appropriate sample of the population); <u>Dreyfus Fund, Inc. v. Royal Bank of Canada</u>,

12    525 F. Supp. 1108, 1116 (S.D.N.Y. 1981) ("To be probative and

13    meaningful...surveys...must rely upon responses by ***potential customers*** of the

14    products in question.") (emphasis added).

15    Second, <u>Eastwood</u>, requires an examination of the totality of the publication,

16    while in this survey, respondents were only allowed to view digital photos of the

17    magazine's cover and spine. <u>Eastwood</u>, 123 F.3d at 1256. ("[W]e look to the totality

18    of the Enquirer's presentation of the interview and find that the editors falsely

19    suggested to the ordinary reader of their publication – as well as those who merely

20    glance at the headlines while waiting at the supermarket checkout counter -- that

21    Eastwood had willingly chatted with someone from the Enquirer.")  Survey

22    respondents were not allowed to examine the photos or the magazine article. This

23    seriousness of this deficiency becomes more apparent when one considers Plaintiff's

24    FAC, which alleges that the magazine as a whole – the cover ***and*** its contents –

25    gave potential customers the impression of Plaintiff's endorsement.

26    The Court tends to agree that the foregoing flaws warrant discarding Honick's

27    survey. In <u>Wendt</u>, the court concluded "surveys are to be admitted as long as they

28    are conducted according to the accepted principles and are relevant."). <u>Wendt</u>, 125

22

1   F.3d at 814. Here, the survey did not sample the correct group, and did not permit

2   those sampled to view all of the relevant evidence bearing on the relevant issue.

3   Moreover, the survey's conclusion – that a reasonable consumer *might* believe that

4   Plaintiff and Defendant are associated – does not meet the correct standard of

5   whether reasonable consumers were *likely* to intimate an association. For all of

6   these reasons, the Court concludes that the survey is not admissible.

7         However, even if the Court concluded that the flaws went to the survey's

8   weight, and not its admissibility, the result would not change; the Court would simply

9   accord it little value. See id. ("Challenges to survey methodology go to the weight

10   given the survey, not its admissibility."). Although Kournikova might argue that a

11   genuine issue of material fact is thereby created, she would be incorrect. Relevant

12   case law holds that "[t]he mere presentation of a survey purporting to show

13   confusion, however, does not itself create a triable issue of fact." Mattel, Inc., v.

14   MCA Records, Inc., 28 F. Supp. 2d 1120, 1133 (C.D. Cal. 1998); Universal City

15   Studios, Inc. v. Nintendo Co., 746 F.3d 112, 118 (2d Cir. 1984) (finding a survey "so

16   badly flawed that it cannot be used to demonstrate the existence of a question of fact

17   on the likelihood of consumer confusion."). Accordingly, even though the Court

18   elected not to strike Plaintiff's seriously flawed survey, it carries insufficient weight to

19   establish a genuine issue of material fact for trial.

20         Because the survey, the class action, and expert report do not provide real

21   evidence of actual confusion, Plaintiff raises no triable issue, and this critical factor

22   weighs heavily in GMC's favor.

23         **v. Marketing Channels Used**

24         "Convergent marketing channels increase the likelihood of confusion."

25   Sleekcraft, 599 F.2d at 353. A substantial likelihood that either party may expand his

26   or her business to compete with the other favors a finding of infringement. See id. at

27   354. GMC argues that the parties do not use similar marketing channels because

28   they are not competitors. GMC maintains that the marketing channels clearly differ

1   because Plaintiff denies any involvement with the adult entertainment industry,

2   which, based on Plaintiff's papers, appears to be correct.  (Mot. at 10).  While

3   Plaintiff may have in fact taken such steps, and while those steps suggest that the

4   parties do not compete in certain specific segments of the entertainment industry, for

5   reasons discussed in Section C.i.a. above, evidence has been presented to establish

6   that the parties compete in some markets and use similar marketing channels in

7   those markets to sell their goods.   Accordingly, this factor weighs in Plaintiff's favor.

8                    **vi.  Likely Degree of Purchaser Care**

9          "Likelihood of confusion is determined on the basis of a 'reasonably prudent

10  customer...What is expected of this reasonably prudent consumer depends on the

11  circumstances." Brookfield Communications, Inc. v. West Coast Entm't Corp., 174

12  F.3d 1036, 1060 (9th Cir. 1999) (quotations omitted); Sleekcraft, 599 F.2d at 353 ("In

13  assessing the likelihood of confusion to the public, the standard used by the court is

14  the typical buyer exercising ordinary caution.") (citations omitted).  GMC asserts,

15  without citation, that customers are less likely to purchase a magazine containing

16  candid photos than a magazine that contains posed photos, because the candid

17  photos will obviously be of an inferior quality.  (Mot. at 10).  Plaintiff points out that

18  GMC has provided no evidence relating to this factor, while a survey compiled by

19  one of Plaintiff's experts, found that 75.3% of the surveyed customers spent less

20  than 60 seconds deciding whether to purchase a magazine like Penthouse.  (Opp at

21  21; Honick Decl., Exh. A).  Accordingly, Plaintiff contends that a determination of the

22  degree of purchaser care is a jury question because an issue of material fact exists

23  as to the amount of care used by the average customer purchasing Penthouse.

24          As to this factor, neither party provides substantial support for its position.

25  However, it is worth noting that a portion of Defendant's customers are subscribers

26  who cannot review the magazine cover before purchase.  For all of the above

27  reasons, this factor is given minimal weight.

28

                                    24

1          **vii.  Intent**

2          "When an alleged infringer knowingly adopts a mark similar to another's,

3    courts will presume an intent to deceive the public." Official Airline Guides, 6 F.3d at

4    1394.  Further, "the inference that can be drawn from an alleged infringer's knowing

5    *adoption of a similar mark focuses on his intent at that time.*"  Entrepreneur Media,

6    Inc. v. Smith, 279 F.3d 1135, 1149 (9th Cir. 2002) (citing Sleekcraft, 599 F.2d at

7    354).

8          Defendant contends that the relevant question for this factor is whether it

9    designed the June 2002 issue of Penthouse in such a way that was likely to confuse

10   its average reader into believing that Plaintiff endorsed the magazine.  (Mot. at 8).

11   Relying on Downing, Plaintiff maintains that the proper question is whether

12   Defendant intended to profit by confusing customers as to Plaintiff's endorsement of

13   Penthouse.  (Opp. at 22).  It appears that both parties are correct.  "The law has long

14   been established that if an infringer 'adopts his designation with the intent of deriving

15   benefit...its intent may be sufficient to justify the inference that there are confusing

16   similarities.'"  Brookfield, 174 F.3d at 1059 (quoting Pac. Telesis v. Int'l Telesis

17   Communications, 994 F.2d 1364, 1369 (9th Cir. 1993)); see also White v. Samsung

18   Elec., 971 F.2d 1395, 1400 (9th Cir. 1992) ("The relevant question is whether the

19   defendants intended to profit by confusing customers" by implying endorsement)

20   (internal quotations omitted).  However, "[a]n inference of confusion has similarly

21   been deemed appropriate where a mark is adopted with the intent to deceive the

22   public."  Id. (citing E&J Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1293 (9th

23   Cir. 1992) and Sleekcraft, 599 F.2d at 354).

24         GMC contends that the June 2002 issue of Penthouse was not designed to

25   confuse customers into believing that Plaintiff endorsed the magazine.  (Mot. at 8).

26   Rather, GMC argues that (1) language on the magazine's cover and headline alert

27   the customer that Plaintiff did not pose for the magazine; and (2) GMC's website

28   statement that "Anna denies [that the pictures are] real thing" (SUF ¶ 8; SGI ¶ 8)

                                          25

1    is sufficient to prevent confusion.  (Mot. at 9).  Pointing to GMC's dire financial

2    condition and admission that celebrity issues are more successful, Plaintiff maintains

3    that GMC intentionally used the photos together with Plaintiff's name in an attempt to

4    increase profits.  (Opp. at 22; SUF ¶¶ 24, 25).

5          Regardless of the reasoning or the applicable standard, it appears that GMC

6    knowingly used Plaintiff's mark.  Accordingly, the intent factor weighs in Plaintiff's

7    favor.

8                    **viii.  Likelihood of Expansion of Product Lines**

9          Because many companies produce or have control over widely diversified

10    products, a reasonable consumer might draw a connection between the producers of

11    different goods bearing similar marks.  See MCCARTHY ON TRADEMARKS § 24:54

12    (West Group 2002).  Therefore, a trademark owner may be afforded greater

13    protection against competing goods where there is a "'strong possibility' that either

14    party may expand his business to compete with the other."  Sleekcraft, 599 F.2d at

15    354 (citing Restatement of Torts § 731(b) & comment c).  Such a strong possibility

16    weighs in favor of finding that the present use is infringing.  Id.

17          Because Plaintiff has gone to great lengths to disassociate herself with

18    Penthouse and has stated that she has no intention of entering the adult

19    entertainment market, (SUF ¶ 9; SGI ¶ 9; Broccolo Decl., Exh.  C), it appears that

20    this factor weighs in GMC's favor.

21                    **ix.  Weighing the *Sleekcraft* Factors**

22          While some of the Sleekcraft factors weigh in Plaintiff's favor, a number of

23    factors, including the critical issue of actual confusion, weigh heavily in favor of GMC.

24    Particularly on the question of confusion, Kournikova's case founders because the

25    "'mere possibility' that consumers may be misled is insufficient to prevail on an

26    endorsement claim."  Cairns, 107 F. Supp. 2d at 1221 (citing Newton v. Thomason,

27    22 F.3d 1455, 1461 (9th Cir. 1994)).  Since Kournikova's evidence at most raises the

28    possibility, as opposed to the likelihood, of confusion, she has not met her burden of

1    demonstrating the existence of genuine issues of material fact that must be resolved

2    at trial.  For these reasons, the motion for summary judgment on the false

3    endorsement claim is **GRANTED**.

### x.  Other Factors

5         GMC contends that the Court need not even reach the <u>Sleekcraft</u> factors to

6    resolve this case because Plaintiff cannot prove that reasonable customers would

7    have been confused as to whether or not she posed or consented to the pictures'

8    publication in <u>Penthouse</u>.  (Mot. at 6).  In support of this argument, GMC points to

9    the magazine's headline, which reads "Exclusive Anna Kournikova *Caught* Close Up

10   On Nude Beach."  (FAC at Exh. A) (emphasis added).  GMC maintains that this

11   clearly intimates that the photos were not voluntarily posed.  (Mot. at 7).  In addition,

12   the content of the related article, which states "Anna did not look at anyone, she did

13   not want to attract attention," (FAC at Exh. A at 46), implies that Kournikova was not

14   posing for the pictures since she was not even facing the camera.  (Mot. at 7).  GMC

15   further contends that the texture and quality of the photographs, as compared to

16   other pictorials in the magazine, demonstrate that the photos were taken

17   spontaneously.  (<u>Id.</u>).  Finally, GMC argues that the website's content, which states

18   that Kournikova had been "caught" nude, and that "Anna denies [the photographs

19   are] the real thing," (FAC at Exh. B), would prevent any customer from believing that

20   she had consented to their publication.  (Mot. at 8).  According to GMC, these facts

21   demonstrate that no reasonable consumer could believe that Kournikova endorsed

22   <u>Penthouse</u> because the website explicitly states that she denies the accuracy of the

23   photographs, and the cover and content of the magazine indicate that Plaintiff did not

24   voluntarily pose for the photographs.

25        While the Court generally agrees with GMC's assessment of this evidence,

26   the Court does not agree that the evidence is outside the <u>Sleekcraft</u> analysis.

27   Rather, this aspect of GMC's argument bears directly on the "confusion" element of

28   the <u>Sleekcraft</u> test and has been considered by the Court in applying that test.  Thus,

1   while the points made in this argument support the Court's ultimate conclusion, the

2   Court does not view the argument as constituting a distinct analytical approach to the

3   false endorsement claim.

4       ### c. Actual Malice

5       Even assuming Plaintiff's evidence raises triable issues of fact as to whether

6   the June 2002 cover of <u>Penthouse</u> created consumer confusion regarding

7   Kournikova's endorsement of the magazine, Plaintiff's false endorsement claim still

8   fails because she cannot establish that GMC acted with actual malice in creating this

9   alleged false impression.

10      Courts have placed limits on Lanham Act lawsuits because of the potential

11  impact on First Amendment rights.  When a public figure (who is complaining about

12  the use of her identity in noncommercial speech) brings a false endorsement claim, it

13  is barred by the First Amendment the plaintiff produces clear and convincing

14  evidence that the defendant acted with actual malice in creating the false impression

15  of endorsement.  <u>See</u> Hoffman v. Capital Cities/ABC Inc., 255 F.3d 1180, 1186,

16  1189 n.3 (9th Cir. 2001).

17      Because the <u>Penthouse</u> cover and article relating to Kournikova are not

18  simple advertisements, they are entitled to the First Amendment's full protection.

19  <u>See id.</u> at 1186.  Thus, at trial a public figure like Kournikova cannot prevail on her

20  false endorsement claim unless she can establish by clear and convincing evidence

21  that GMC subjectively intended that the average reader – or the average browser –

22  believe that Kournikova voluntarily posed in <u>Penthouse</u>, or otherwise approved use

23  of her name and likeness.  <u>See id.</u> at 1189 n.3; <u>see also</u> Solano v. Playgirl, Inc., 292

24  F.3d 1078, 1084 (9th Cir. 2002) (defining the "actual malice" standard as a knowing

25  or reckless creation of a false impression).  Accordingly, "[i]t is not enough to show

26  that [GMC] unknowingly misled readers into thinking [Kournikova] had actually posed

27  for the altered photograph.  Mere negligence is not enough to demonstrate actual

28  malice." <u>Hoffman</u>, 255 F.3d at 1187; <u>see also</u> Eastwood, 123 F.3d at 1256 (finding

1   that a plaintiff must prove "malice by clear and convincing evidence," which is

2   described as "a heavy burden, far in excess of the preponderance sufficient for most

3   civil litigation.") (citations and quotations omitted).  Courts, however, will infer actual

4   malice from objective facts that "provide evidence of negligence, motive, and intent

5   such that an accumulation of the evidence and appropriate inferences supports the

6   existence of actual malice." Solano, 292 F.3d at 1085 (quoting Bose Corp. v.

7   Consumers Union, 692 F.2d 189, 196 (1st Cir. 1982)).

8         Both parties properly acknowledge that Plaintiff, as a public figure, must

9   satisfy the constitutional requirement of actual malice in order to hold Defendant

10   liable for the "false statement of fact at issue," or alleged false impressions created

11   by its publications.  (Opp. at 23; Reply at 7).  However, the parties differ in their

12   interpretation of "false statement."  GMC contends that Plaintiff cannot prove an

13   intention to confuse readers regarding Plaintiff's association (or lack thereof) with

14   Penthouse.  (Mot. at 6).  Plaintiff asserts that the evidence demonstrates that GMC

15   acted with actual malice by knowingly creating the false impression that Kournikova

16   appeared in the topless photographs.  (Opp. at 23).  Plaintiff then identifies a number

17   of "facts" relating to Defendant's alleged failure to properly investigate the

18   authenticity of the topless photographs.  (Id.).  While this evidence may be relevant

19   to the determination of whether Defendant acted with actual malice for purposes of

20   Plaintiff's defamation claim (which is not at issue in this motion), this evidence is

21   irrelevant to Plaintiff's false endorsement claim.  The relevant inquiry for Plaintiff's

22   false endorsement claim is whether the evidence presented is sufficient to establish,

23   by clear and convincing evidence, that GMC intended to confuse consumers into

24   believing that Kournikova actually endorsed Penthouse (i.e., voluntarily posed for the

25   photographs, or otherwise approved the use of her identity).  See Hoffman, 255 F.3d

26   at 1186, 1189 n.3.  If so, then the matter should be submitted to a jury for

27   determination; if not, then summary judgment should be granted in GMC's favor.

28

1    In <u>Solano</u>, the plaintiff, an actor on the television program "Baywatch," sued

2    <u>Playgirl</u> for its depiction of him on the cover of the January 1999 issue of <u>Playgirl</u>

3    Magazine. <u>Solano</u>, 292 F.3d at 1080. Solano was shown wearing his typical

4    "Baywatch" uniform, shirtless and wearing his red lifeguard trunks, directly below a

5    heading that read: "TV Guys. PRIMETIME'S SEXY YOUNG STARS EXPOSED."

6    <u>Id.</u> Although Solano did not actually appear nude inside the magazine, he sued

7    <u>Playgirl</u> alleging it deliberately created the false impression that he did appear naked,

8    and therefore that he endorsed <u>Playgirl</u> by voluntarily posing for the magazine. <u>Id.</u> at

9    1080-81. The district court granted <u>Playgirl</u>'s summary judgment motion, finding that

10   Solano had failed to establish that <u>Playgirl</u> created a false impression, or that it acted

11   with actual malice. <u>Id.</u> at 1081. The Ninth Circuit reversed because it found

12   conflicting evidence regarding the existence of actual malice on the part of <u>Playgirl</u>'s

13   editors in assembling the January 1999 issue. <u>Id.</u> at 1085. For example, an

14   associate editor at <u>Playgirl</u> testified during her deposition that there had been

15   discussion during meetings that the January 1999 cover layout implied that Solano

16   appeared nude in a centerfold inside the magazine. <u>Id.</u> Solano also introduced

17   evidence that <u>Playgirl</u>'s senior vice president and art director were both aware that

18   some members of the editorial staff were concerned that the cover might falsely

19   imply that Solano appeared nude inside the magazine. <u>Id.</u> at 1086.

20   Unlike Solano, Kournikova has not produced any evidence from which this

21   Court can infer that GMC intentionally designed the June 2002 edition of <u>Penthouse</u>

22   in a way that was **likely** to confuse the average reader into believing that Kournikova

23   endorsed, or was in anyway associated with, the magazine. First, Plaintiff fails to

24   provide the Court with any evidence regarding the editors' intent in creating the cover

25   layout of the June 2002 edition. Moreover, the headline on the magazine cover

26   completely undermines Plaintiff's theory. Had GMC truly been attempting to confuse

27   consumers into believing that Kournikova endorsed <u>Penthouse</u>, it would not have

28   used the phrase "CAUGHT CLOSE UP ON NUDE BEACH" on the cover of the June

1    2002 issue.  Rather, GMC could have used a number of other headlines, such as

2    "EXCLUSIVE NUDE PHOTOS OF ANNA KOURNIKOVA" or "ANNA KOURNIKOVA

3    EXPOSED."  Such headlines would be more likely to cause consumer confusion

4    regarding Kournikova's endorsement, and the Court would be justified in inferring

5    from the use of such headlines that GMC intentionally created this false impression.

6        In short, Plaintiff has not produced clear and convincing evidence from which

7    a jury could conclude that GMC acted with actual malice in creating the false

8    impression that Kournikova endorsed Penthouse.

9        **d. Request for Relief under 56(f)**

10       As a final effort to avoid summary judgment, Plaintiff, in her opposition,

11   requests additional time to conduct discovery.  Plaintiff complains that GMC has

12   "stonewalled [her] diligent pursuit for discovery, thereby preventing her from

13   gathering critical facts needed to oppose this Motion." (Opp. at 25).  However,

14   Plaintiff has not followed the requisite procedure for seeking additional time pursuant

15   to 56(f).  Plaintiff has not filed a proper Rule 56(f) motion, and mere mention of 56(f)

16   does not transform Plaintiff's opposition into such a motion, for "[r]eferences in

17   memoranda and declarations to a need for discovery do not qualify as motions under

18   Rule 56(f)." Weinberg v. Whatcom County, 241 F.3d 746, 751 (9th Cir. 2001) (citing

19   Brae Transp., Inc. v. Coopers & Lybrand, 790 F.2d 1439, 1443 (9th Cir. 1986)).

20       In addition, Plaintiff has made no mention of the type of information she would

21   hope or expect to find should she be allowed additional discovery, or how such

22   information might reveal a genuine issue of material fact for trial.   Finally, it is clear

23   that Plaintiff had adequate notice of this motion and access to responsive documents

24   since GMC had made multiple offers to expedite document production. (Reply at 24,

25   25).  However, Plaintiff rejected these offers. (Id.).  For these many reasons, the

26   Court **DENIES** Plaintiff's request for relief under Rule 56(f).

27   //

28   //

31

1

IV.

2

CONCLUSION

3    For the reasons set forth above, the Court **GRANTS** Defendant's Motion for

4    Summary Judgment on the Fifth Cause of Action of the First Amended Complaint.

5

6    IT IS SO ORDERED.

7

8    DATED: May 2, 2003

9

10

11   Judge Gary Allen Fees
     United States District Court

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28